UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
++++++++++++++++++++++++++++++++++++++++++++++++++++++

David D. BACH,

        Plaintiff,

   -v-                 02-CV-1500

George E. PATAKI, in his official capacity as Governor of New York; Eliot SPITZER, in his official capacity as Attorney General of New York; James W. MCMAHON, in his official capacity as Superintendent, New York State Police; J. Richard BOCKELMANN, in his official capacity as Ulster County Sheriff,

        Defendants.
++++++++++++++++++++++++++++++++++++++++++++++++++++++

APPEARANCES:

David D. Bach, Esq.
632 Secotan Road
Virginia Beach, Virginia 23451
Plaintiff, *Pro Se*

Hon. Eliot Spitzer
Attorney General of the State of New York
Gerald J. Rock, Esq., Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants Pataki, Spitzer and McMahon

Office of Ulster County Attorney
Francis T. Murray, Esq., of counsel
P.O. Box 1800
240 Fair Street
Kingston, New York 12401
Attorney for Defendant Bockelmann

**Hon. Norman A. Mordue, D.J.:**

**MEMORANDUM-DECISION AND ORDER**

## INTRODUCTION

In this action for declaratory and permanent injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3),(4), plaintiff moves for a preliminary injunction, permanent injunction and declaratory judgment pending final judgment (Dkt. No. 2). He moves separately to consolidate the trial on the merits with a hearing on the application for a preliminary injunction (Dkt. No. 7). Defendants George E. Pataki, in his official capacity as Governor of New York, Eliot Spitzer, in his official capacity as Attorney General of New York, and James W. McMahon, in his official capacity as Superintendent, New York State Police (collectively "state defendants") cross-move to dismiss the complaint (Dkt. No 10). For reasons set forth herein, the Court denies plaintiff's motions and grants the state defendants' motion to dismiss the complaint against them.

Plaintiff, a nonresident of New York, challenges New York's statutory scheme pertaining to the issuance of permits to carry or possess concealed firearms in the state. Under the scheme, most people without significant contacts to New York are not eligible for such permits and thus are prevented from legally carrying such weapons while traveling in New York. In his initial pleading, denominated "Plaintiff's Application for Preliminary and Permanent Injunction, and Declaratory Relief,"[1] plaintiff, a domiciliary of the state of Virginia, summarizes his claim as follows:

> This Application seeks declaratory and injunctive relief to protect the substantive constitutional rights of ordinary, law-abiding, nonresident citizens of sister States to

---

[1] Plaintiff has not served or filed a document denominated a complaint. With his summons he served and filed "Plaintiff's Application for Preliminary and Permanent Injunction, and Declaratory Relief" (Dkt. No. 1). The Court treats this document as the complaint.

keep and bear otherwise lawful firearms while temporarily residing, visiting and traveling within the State of New York; and to protect these citizens from unlawful discrimination and criminal prosecution under State law. Bach seeks a declaratory judgment that New York's licensing provisions (as codified in NY Penal Law §§ 265.00 and 400.00, et seq.), facially, and as applied, violate the fundamental personal rights, privileges and immunities of ordinary, law-abiding, nonresident citizens to keep and bear arms, and travel interstate under the Second and Fourteenth Amendments, and Article IV of the United States Constitution. In addition, Bach requests the Court to grant a preliminary injunctive order pending a determination of the merits to prevent any further irreparable harm to Bach and other ordinary nonresident citizens whose constitutional rights continue to be infringed under New York law.

In his affidavit in support of the claim, plaintiff avers:

1. I am a citizen of the United States and the State of Virginia where I maintain my domicile. I possess a permit to carry a concealed handgun in accordance with Virginia law and own a 9mm pistol (model P-85, manufactured by Sturm, Ruger and Company of Southport, Connecticut) substantially similar to the type used by the United States Armed Forces, National Guard, and law enforcement.
2. I am a Commissioned Officer in the United States Naval Reserve with approximately twenty-five years of service, including twelve years of active duty service. Due to my military service with the Navy's Underwater Demolition and SEAL Teams, I have extensive experience in handling and providing instruction in different types of small arms. I currently hold a Department of Defense Top Secret Security Clearance and have never been convicted of a felony, firearms related crime, or any other serious offense.
3. I am a graduate from an accredited law school and have been a licensed attorney in good standing from the Commonwealth of Pennsylvania since 1985. During the past seventeen years, I have been employed by the Office of the General Counsel, Department of the Navy as an attorney, except for a period of approximately four-and-a-half years when I returned to active duty as a Navy SEAL both during and after Operation DESERT STORM.
4. I have been married for seventeen years and have three young children. Although born in New Jersey, I grew up in the Town of Saugerties, County of Ulster, New York where my parents continue to reside.
5. My parents own a small farm and my family and I periodically visit them for several days at a time. During the ten-hour drive between Virginia and Upstate New York, my family and I travel on dimly lit rural roads, busy streets and highways some of which are in densely populated areas that have extremely high crime rates. Should our vehicle breakdown in one of these areas, or should we have an accident, we would be vulnerable to criminal attack because we are required to travel unarmed. In addition, because of my occupation within the Department of Defense and Naval Special Warfare, I believe my family and I are at greater risk of being targeted by those seek to carry out symbolic acts of terror. Therefore, I wish to possess and carry my personal firearm to protect my family

and myself from acts of criminal violence in accordance with New York State law during our journey and while temporarily visiting within the State's jurisdiction.

6. Law enforcement personnel are relatively few and far between and have neither a legal duty to respond to an emergency 911 call nor protect a citizen or family from a violent criminal acts. Despite the exceptional efforts of law enforcement, they cannot be everywhere at all times as evidenced by the tens of thousands of ordinary, law-abiding American citizens who have been, and continue to be brutally attacked, terrorized and murdered by sadistic criminals in New York State.

7. Following the attacks on the World Trade Center in New York, the Pentagon in Virginia, and a commercial airliner in Pennsylvania, the President and Attorney General of the United States, and Director of Homeland Security repeatedly warned American citizens of impending terrorist attacks, including the possible employment of weapons of mass destruction. Additionally, they have notified the public of the vital need for every citizen to be watchful and vigilant as the Nation remains on heightened alert indefinitely. Because the United States is in a state of war at home and abroad, and thousands of citizens have been slaughtered by foreign enemies in New York, Virginia and Pennsylvania, I continue to maintain a heightened concern for the safety and welfare of my family, particularly when traveling interstate through unfamiliar territory.

8. As a parent, I bear ultimate responsibility for the safety, welfare, protection and defense of my children. But because New York State law prohibits me from obtaining the required license to possess and carry an operable pistol or revolver, I am unable to effectively protect and defend my family from acts of criminal violence while temporarily visiting and traveling within the State. Because attempting to use a cumbersome long-gun as a personal defense weapon is an ineffective alternative to a handgun, particularly in an automobile, I am deprived of the only rational and effective means I have to repel an attack from a violent criminal predator.

9. Due to my military training, I am aware that law enforcement routinely chooses handguns as its primary weapon of protection. When used properly, a handgun offers an extremely effective means of personal protection in close combat situations, such as stopping violent criminals.

10. Although the State of New York has deprived me of the rational and effective means to protect and defend my family, the State would be immune from liability should my family or I be harmed by criminals, even if the State were to be found grossly negligent.

11. Because of my concern for my family's protection and safety, I mailed written inquiries to Eliot Spitzer, New York State Attorney General; Sergeant James Sherman, New York State Police, Pistol Permit Bureau; and J. Richard Bockelmann, Ulster County Sheriff on November 14, 2001. My purpose in contacting these government officials was to confirm my understanding of New York law whereby an ordinary nonresident from another State who does not meet one of the narrowly prescribed exemptions under NY Penal Law § 265.20, is ineligible to obtain a New York firearms license, and thus submission of a firearms license application and nonrefundable fee would be a futile act.

12. By letter of November 27, 2001, Peter A. Drago, Director of Public Information and

Correspondence, State of New York, Office of the Attorney General referred me to the New York State Police in Albany as the "appropriate authority to contact with your request."

13. By letter of December 5, 2001, Sergeant James Sherman of the New York State Police, Pistol Bureau, confirmed that "no exemption exists which would enable you to possess a handgun in New York State." Further, "[t]here are no provisions for the issuance of a carry permit, temporary or otherwise, to anyone not a permanent resident of New York State nor does New York State recognize pistol permits issued by other states." Finally, he warned that anyone "found to be in possession of a pistol or revolver that is not registered on a New York State Pistol Permit, exempt personnel excluded, would be subject to automatic forfeiture of the firearm in question and criminal prosecution."

14. By letter of December 18, 2001, Ulster County Undersheriff, George A. Wood confirmed that "[t]here are two ways in New York State to lawfully possess a pistol/revolver. First is to be licensed, as outlined in §400.00, and the second is to meet one of the 'exceptions' outlined in §265.20 of the NYS Penal Law." Further, he informed me that I clearly would not meet the exemption for military personnel under New York Penal Law § 265.20(1)(d) while temporarily visiting in the State despite my current military status as a Selected Naval Reservist.

15. Based on the foregoing responses regarding the State's application of New York law, I concluded that neither I nor other ordinary nonresidents, i.e., those not meeting any exemption under NY Penal Law § 265.20, are eligible to obtain a valid New York State firearms license, and that submission of a firearms license application and nonrefundable fee would be a futile act since by law it could not be approved.

Plaintiff's causes of action assert violation of his right to keep and bear arms under the Second and Fourteenth Amendments; violation of his right under the Privileges and Immunities Clause to keep and bear lawful firearms while traveling interstate; discriminatory treatment of nonresidents of New York resulting in a denial of equal protection; deprivation of substantive due process; and deprivation of the privileges and immunities of state residents due to unlawful burdens on the rights of nonresidents to move freely in or through New York.

Under New York's statutory scheme, a person who qualifies for an exemption under N.Y. Penal Law § 265.20 is not subject to prosecution under New York's criminal statutes proscribing possession of a weapon. Grounds for exemption under section 265.20 include

"[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section 400.00" of the Penal Law. Section 400.00(3)(a) provides:

> Applications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper; and, in the case of a license as gunsmith or dealer in firearms, to the licensing officer where such place of business is located.

With respect to the statutory scheme, the state defendants explain:

> A variety of persons with significant contacts with the State, therefore, are statutorily eligible to apply for a permit, namely New York residents and non-residents who have their principal place of employment or principal place of business as a merchant or storekeeper in New York. The identity of the licensing officer referred to in this section depends on the locality. See N.Y. Penal Law § 265.00(10). Whether a permit is, in turn, actually granted is within the discretion of that licensing officer. Under these provisions, persons, even when granted a permit, are not provided a blanket license to carry any weapon. Instead, each license specifies in detail each weapon covered by that license and whether that license is issued as a license to carry or possess on the premises. N.Y. Penal Law § 400.00(7)[.]

(Citations omitted.)

## DISCUSSION

**Standing**

In support of their dismissal motion, the state defendants first argue that plaintiff lacks standing to maintain the action because, as plaintiff concedes, he has not applied for a permit under section 400.00 of New York's Penal Law. "As a general rule, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." *Prayze FM v. Federal Communications Comm'n*, 214 F.3d 245, 251 (2d Cir. 2000) (quoting *Jackson-Bey v. Hanslmaier*, 115 F.2d 1091, 1096 (2d Cir. 1997) (internal quote omitted)). "In many cases, requiring litigants to actually apply for a license before challenging

a licensing scheme prevent[s] courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also ... protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *See Sammon v. New Jersey Bd. of Medical Examiners*, 66 F.3d 639, 643 (3d Cir. 1995) (citation and internal quote omitted).

Plaintiff contends that he has standing despite his failure to apply for a permit because in his case applying for a permit would have been futile. Under well-established law, a plaintiff may be excused from the threshold standing requirement that he submit to the challenged policy if he "makes a substantial showing that application for the benefit ... would have been futile." *Jackson-Bey*, 115 F.3d at 1096. For example, in *Sammon*, plaintiffs were excused from applying for licenses on the ground of futility where there was no indication that they could possibly obtain licenses without first meeting the challenged requirement. 66 F.3d at 643. In contrast, in *Prayze FM*, the Second Circuit held that the plaintiff had failed to demonstrate futility where the challenged requirement was subject to waiver and there was no history from which to judge how the licensing authority would handle a waiver request. 214 F.3d at 251.

Here, the Court concludes that plaintiff's failure to apply for a permit under section 400.00 of the Penal Law does not deprive him of standing. By his affidavit, plaintiff has established facts demonstrating that as a matter of law he does not qualify for a permit under section 400.00 of New York's Penal Law by its plain terms and as it has been construed by New York courts. *See, e.g., Mahoney v. Lewis*, 605 N.Y.S.2d 168 (3d Dep't 1993); *People v.*

*Perez*, 325 N.Y.S.2d 183, 186 (Onondaga Co. Ct. 1971). Defendants do not dispute plaintiff's factual allegations in this regard, nor do they seek discovery on the issue, nor do they argue that there is any factual scenario in which plaintiff, a Virginia resident who has no employment or business in New York, could possibly qualify for a permit under New York law. Moreover, in the case at bar, as distinguished from *Prayze FM*, there is nothing to suggest that the challenged residency requirement is subject to waiver or other discretionary action. *See* 214 F.3d at 251. Requiring plaintiff to apply for a permit, therefore, "would serve no purpose." *Id.* Accordingly, plaintiff has made a substantial showing that application for the permit would have been futile. *See Jackson-Bey*, 115 F.3d at 1096.

**Second Amendment: Individual or Collective Right?**

Plaintiff contends that New York's law infringes his rights under the Second Amendment to the United States Constitution, which states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." According to plaintiff, this amendment "protects individual Americans in their rights to keep and to bear arms regardless of whether they are a member of a select militia or performing active military service or training."

Plaintiff's reading of the Second Amendment guarantee is not supported by the sparse Supreme Court guidance on the question. In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court reversed the dismissal of an indictment charging two men with illegally transporting a shotgun having a barrel less than eighteen inches in length in violation of the National Firearms Act. The *Miller* court rejected the district court's conclusion that the Act, which regulated certain firearms including shotguns having a barrel of less than eighteen

inches in length, violated the Second Amendment. In language which has been described as "somewhat cryptic," *Silveira v. Lockyer*, 312 F.3d 1052, 1061 (9th Cir. 2003), *petition for cert. filed* 72 USLW 3093 (July 3, 2003), and "not entirely illuminating," *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir. 1999), the *Miller* court stated:

> In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Miller* is almost invariably read as demonstrating that the Supreme Court does not view the Second Amendment as safeguarding a fundamental individual right. For example, the Second Circuit, noting the concession by a criminal defendant that rational-basis review applies to his equal protection challenge to a federal firearms statute, stated:

> [Defendant's] concession ... is clearly correct since the right to possess a gun is clearly not a fundamental right, *cf. United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (in the absence of evidence showing that firearm has "some reasonable relationship to the preservation or efficiency of a well regulated militia," Second Amendment does not guarantee right to keep and bear such a weapon)[.]

*United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984)[2]; *accord Silveira*, 312 F.3d at 1066 (referring to "*Miller's* implicit rejection of the traditional individual rights position."); *Love v. Pepersack*, 47 F.3d 120, 124 (4th Cir. 1995) ("Since [*Miller*], the lower federal courts have uniformly held that the Second Amendment preserves a collective rather than an individual right."); *but see United States v. Emerson*, 270 F.3d 203, 226 (5th Cir. 2001) (*Miller* does not

---

[2] The Second Circuit's treatment of *Miller* in two unpublished decisions is consistent with that in *Toner*. *See United States v. Scanio*, 165 F.3d 15 (Table), 1998 WL 802060, *2 (2d Cir. 1998); *Lawson v. Kirschner*, 152 F.3d 919 (Table), 1998 WL 433014, *2 (2d Cir. 1998).

support the collective rights approach to the Second Amendment); *also see Warin*, 530 F.2d 103, 106 (6th Cir. 1976) and *Cases v. United States*, 131 F.2d 916, 922 (1st Cir. 1942) (the Supreme Court did not intend to formulate a general rule in *Miller*, but merely dealt with the facts of that case).

      The Supreme Court's few subsequent references to *Miller* offer little further guidance as to the Supreme Court's view of the Second Amendment.[3] In light of the wording of *Miller*, the fact that it has never been disavowed by the Supreme Court, and the manner in which it has been construed by the Second Circuit and most other circuit courts, the Court reads *Miller*

---

[3] In *Adams v. Williams*, Justice Douglas, dissenting from a decision upholding the seizure of a weapon during a *Terry* stop, stated his opinion that the police problem arising from illegal weapons "is an acute one not because of the Fourth Amendment, but because of the ease with which anyone can acquire a pistol." 407 U.S. 143, 150 (1972). After stating that "[t]here is no reason why all pistols should not be barred to everyone except the police[,]" he continued: "The leading case is *United States v. Miller*, upholding a federal law making criminal the shipment in interstate commerce of a sawed-off shotgun. The law was upheld, there being no evidence that a sawed-off shotgun had some reasonable relationship to the preservation or efficiency of a well regulated militia. The Second Amendment, it was held, must be interpreted and applied with the view of maintaining a militia." *Id.* (internal quotes and citation to *Miller* omitted).

More recently, in *Lewis v. United States*, the court rejected a challenge to a federal firearms statute prohibiting a felon from possessing a firearm even if the predicate felony may be subject to collateral attack on constitutional grounds. In a footnote, the court stated that the legislative restrictions on the use of firearms do not "trench upon any constitutionally protected liberties[,]" citing *Miller*. 445 U.S. 55, 65 n.8 (1980).

The most recent reference by the high court to *Miller* is found in *Printz v. United States*, 521 U.S. 898 (1997), in which the Court struck down as violative of the Tenth Amendment the provision of the Brady Handgun Violence Prevention Act imposing on state officers the obligation to conduct background checks on prospective handgun purchasers. In his concurring opinion, Justice Thomas observed that the court had not had recent occasion to consider the nature of the substantive right safeguarded by the Second Amendment. He stated in a footnote: "In *Miller*, we determined that the Second Amendment did not guarantee a citizen's right to possess a sawed-off shotgun because that weapon had not been shown to be ordinary military equipment that could contribute to the common defense. The Court did not, however, attempt to define, or otherwise construe, the substantive right protected by the Second Amendment." *Id.* at 938 n.1 (internal quotes and citation to *Miller* omitted).

as lending support to the state defendants' position that the Second Amendment does not secure an individual right.

In addition to the language in *Miller*, further support for the conclusion that the Second Amendment does not secure an individual right is found in Second Circuit authority, *see Toner*, 728 F.2d at 128 ("the right to possess a gun is clearly not a fundamental right"), and the heavy weight of authority in other circuits. *See Silveira*, 312 F.3d at 1066 (9th Cir.) ("[T]he Second Amendment does not provide an individual right to own or possess guns or other firearms[.]"); *United States v. Graham*, 305 F.3d 1094, 1106 (10th Cir. 2002), *cert. denied* 537 U.S. 1142 (2003) (the right to bear arms is a collective rather than an individual right); *Love*, 47 F.3d at 124 (4th Cir.) ("[T]he amendment does not confer an absolute individual right to bear any type of firearm."); *Warin*, 530 F.2d at 106 (6th Cir.) ("It is clear that the Second Amendment guarantees a collective rather than an individual right."); *Dew v. United States*, 1998 WL 159060, *6 (S.D.N.Y. 1998), *aff'd on other grounds* 192 F.3d 366 (2d Cir. 1999) ("It is settled constitutional law that the Second Amendment is not a source of individual rights."); *Hamilton v. Accu-Tek*, 935 F.Supp. 1307, 1318 (E.D.N.Y. 1996) (same); *but see Emerson*, 270 F.3d at 260 (5th Cir.) (the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms, such as the pistol involved here, that are suitable as personal, individual weapons[.]").

In view of the weight of authority, including the present state of Supreme Court and Second Circuit jurisprudence, the Court adopts the view that the Second Amendment is not a source of individual rights. Accordingly, plaintiff has not alleged an infringement of any

Second Amendment right.[4]

**Right to Travel**

Plaintiff also urges that New York's permit scheme infringes his right to travel. "The constitutional right to travel from one State to another ... occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757 (1966). One component of the right to travel is the right of a nonresident of a state "to be treated as a welcome visitor rather than an unfriendly alien when temporarily present" in that state. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). This right is protected by the Privileges and Immunities Clause of Article IV of the United States Constitution, which guarantees that a citizen of one state who travels temporarily in another state is entitled to enjoy the privileges and immunities of the citizens of

---

4

Also in support of their motion to dismiss the complaint, the state defendants argue that the Second Amendment does not enjoin state action, another issue which is not free from doubt. In arguing that the Second Amendment is not incorporated by the Fourteenth Amendment and thus does not constrain actions by the states, the state defendants rely primarily on *United States v. Cruikshank*, 92 U.S. 542, 592 (1876) (stating that the Second Amendment "is one of the amendments that has no other effect than to restrict the powers of the National Government.") and *Presser v. Illinois*, 116 U.S. 252 (1886) (reaffirming *Cruikshank*). Circuit courts have recently cited these two cases for the proposition that the Second Amendment does not apply to the states. See *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 538 n.18 (6th Cir. 1998); *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995). The Fifth Circuit in *Emerson*, however, states with respect to *Cruikshank* and its progeny: "As these holdings all came well before the Supreme Court began the process of incorporating certain provisions of the first eight amendments into the Due Process Clause of the Fourteenth Amendment, and as they ultimately rest on a rationale equally applicable to all those amendments, none of them establishes any principle governing any of the issues now before us." 270 F.3d at 221 n.13; *accord Silveira*, 312 F.3d at 1067 n.17 (stating that *Cruikshank* and *Presser* "rest on a principle that is now thoroughly discredited."). Neither the Fifth nor the Ninth Circuit, however, takes a position as to the present-day status of the question of whether the Second Amendment binds the states. In view of this Court's holding that the Second Amendment is not a source of individual rights and that therefore plaintiff has not alleged an infringement of a right protected by the Second Amendment, the Court does not decide this question.

the state that he visits. *Id.* This right does not, however, guarantee to the temporary visitor of a state the enjoyment of all the rights enjoyed by *bona fide* residents of that state.[5] The Supreme Court has explained:

> Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with the due regard for the principle that the states should have considerable leeway in analyzing local evils and in prescribing appropriate cures.

*Toomer v. Witsell*, 334 U.S. 385, 396 (1948).

This Court finds that New York's permit scheme bears a close relationship to substantial and valid reasons for the disparate treatment of nonresident travelers, beyond the mere fact that they are citizens of other states. New York clearly has a strong interest in licensing firearms. "The licensing procedures set forth in the statute are designed to insure that only persons of acceptable background and character are permitted to carry and possess certain handguns. They are further designed to provide a method of recording information on the identity of persons possessing such weapons and the weapons themselves." *In re Davies*, 506 N.Y.S.2d 626, 628 (N.Y. Sup. Ct. 1986); *accord People v. Moore*, 486 N.Y.S.2d 642, 644

---

[5] As stated by the court in *Martinez v. Bynum*:
> A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. Such a requirement ... [generally] does not burden or penalize the constitutional right of interstate travel, for any person is free to move to a State and to establish residence there. A bona fide residence requirement simply requires that the person does establish residence before demanding the services that are restricted to residents.

461 U.S. 321, 328-29 (1983).

(N.Y.City Crim.Ct. 1985). Thus, the proper processing of permit applications is "vitally essential to public order and safety." *Federation of N.Y. State Rifle and Pistol Clubs, Inc. v. McGuire*, 420 N.Y.S.2d 602, 603 (N.Y. Sup.Ct. 1979). In ruling on a permit application the licensing authority must investigate all statements in the application, take fingerprints and physical descriptive data and check the applicant's criminal record through federal and state authorities. *See* N.Y. Penal Law § 400.00(4). One court observed that "it would be impossible to thoroughly check first of all who is validly traveling through the state, and secondly make a complete check as to background and character." *People v. Perez*, 325 N.Y.S.2d 183, 186 (Onondaga Co. Ct. 1971). The state defendants correctly contend that "[t]he practical implications of requiring New York to accept applications from all nonresidents are apparent. First, the strain on investigatory resources would be significantly increased. More importantly, however, the ability to obtain, and verify, information would be negatively impacted were New York officials required to make inquiries in other states. Nor can it be argued that New York could simply enter into agreements with other jurisdictions to do such work for the licensing county as to do so would run a significant risk of a lack of uniformity in the licensing regime."

The administrative problems in investigating, monitoring, enforcing and revoking permits where the applicant does not have residency, employment or business ties with New York and the resultant likelihood of errors, would be inimical to New York's scheme of licensing firearms as a means of controlling their possession for the public good. Accordingly, as the state defendants contend, New York acted reasonably in denying the privilege to those with relatively remote contacts to New York. Likewise, allowing

-14-

nonresidents with licenses from other states to carry weapons in New York without complying with New York requirements has the potential to present administrative problems and interfere with the achievement of New York's licensing goals.

The Court concludes that the factor of residence has a substantial and legitimate connection with the purposes of the permit scheme such that the disparate treatment of nonresidents is justifiable. *See Perez*, 325 N.Y.S.2d at 185 ("The substantial danger to the public interest which would be caused by the unrestricted flow of dangerous weapons into and through the state, possessed by countless travelers, warrants the degree of discrimination set out [in] the statute."); *Application of Ware*, 474 A.2d 131, 132-33 (Del. Sup. Ct. 1984) (rejecting the petitioner's argument that Delaware's refusal to allow nonresidents to carry concealed deadly weapons in the state offends the Privileges and Immunities Clause and finding that "the factor of residence has a legitimate connection with the regulation in question so that such a classification is justifiable."). Thus, the Court rejects plaintiff's argument that New York's permit scheme impermissibly impairs his right to travel.

**Equal Protection**

As the Supreme Court has observed: "The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Accordingly, the Supreme Court has "attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, [the court] will uphold the legislative classification so long as it bears a rational relation to some

legitimate end." *Id.* Where, however, a state statute burdens a fundamental right or targets a suspect class, it is subject to heightened scrutiny under the Fourteenth Amendment's Equal Protection Clause. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1986).

Here, plaintiff asserts that the Second Amendment secures a fundamental individual right to keep and bear arms and that therefore New York's statutory permit scheme, which burdens nonresidents' exercise of that right, is subject to strict scrutiny under the Equal Protection Clause. Having concluded, however, that under the present state of the law, plaintiff has no individual Second Amendment right to own or possess weapons, the Court applies rational-basis review in evaluating plaintiff's equal protection challenge to the statutory scheme. *See Toner*, 728 F.2d. at 128 (applying rational basis standard to equal protection challenge to federal firearms statute "since the right to possess a gun is clearly not a fundamental right"); *Silveira*, 312 F.3d at 1088 (same).

In undertaking rational-basis review, the Court notes that "the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 439. (1986). Under the rational-basis standard, the party attacking a legislative classification bears the burden of demonstrating that there is no reasonable basis for the challenged distinction. *See Silveira*, 312 F.3d at 1089.

For the reasons set forth above in the discussion of the right to travel, the Court finds that New York has a reasonable basis for the challenged distinction. Accordingly, plaintiff has not demonstrated that there is no rational connection between the state's objective for its legislative classification and the means by which it classifies its citizens. *See id.* at 1088-89.

His equal protection argument lacks merit.

**Substantive Due Process**

In reviewing plaintiff's claim that he was deprived of substantive due process, the Court recognizes that "[t]he touchstone of due process is protection of the individual against arbitrary action of government[.]" *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *accord Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense[.]" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citations and internal quotes omitted). "[T]he due process clause was intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression." *Id.* (citations and internal quotes omitted). "To this end, for half a century now [the Supreme Court has] ... spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* Measured by this standard, plaintiff's allegations fall far short of stating a claim for deprivation of substantive due process.

## CONCLUSION

Inasmuch as there are no material factual issues bearing on plaintiff's motion for interim relief, there is no need for a hearing with respect to that motion and no basis to consolidate such a hearing with a trial on the merits. Plaintiff has not demonstrated his entitlement to interim relief against any defendant because he has not demonstrated irreparable harm should an injunction not be granted, nor has he shown either a likelihood of success on the merits or sufficiently serious questions going to the merits. *See Resolution Trust Corp. v. Elman*, 949 F. 2d 624, 626 (2d Cir. 1991).

With respect to the state defendants' motion to dismiss the complaint, the Court has read the complaint generously, accepting the truth of and drawing all reasonable inferences from all well-pleaded factual allegations. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). The Court concludes that it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief. *See Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994). Accordingly, the complaint is dismissed in its entirety insofar as it pertains to the state defendants.

It is therefore

ORDERED that plaintiff's motion for a preliminary injunction, permanent injunction and declaratory judgment pending final judgment (Dkt. No. 2) is denied as to all defendants; and it is further

ORDERED that plaintiff's motion to consolidate the trial on the merits with a hearing on the application for a preliminary injunction (Dkt. No. 7) is denied; and it is further

ORDERED that the cross motion by defendants George E. Pataki, in his official capacity as Governor of New York, Eliot Spitzer, in his official capacity as Attorney General of New York, and James W. McMahon, in his official capacity as Superintendent, New York State Police, to dismiss the complaint (Dkt. No. 10) is granted and all claims against them are dismissed in their entirety.

IT IS SO ORDERED.

September 23, 2003
Syracuse, New York

Hon. Norman A. Mordue
United States District Judge